**In the Matter of the Application of Myles GREENBERG and Frances M. Mulligan, Petitioners,**

v.

**Anthony F. VETERAN, et al., Respondents.**

No. 89 Civ. 0591 (GLG).

United States District Court, S.D. New York.

April 17, 1989.

---

Lovett & Gould, White Plains, N.Y. (Jonathan Lovett, of counsel), for petitioners.

Paul Agresta, Town Atty., Town of Greenburgh, Elmsford, N.Y., for respondents Anthony F. Veteran and Susan Tolchin.

Cuddy & Feder, White Plains, N.Y. (Ruth E. Roth, of counsel), for respondents Keren Developments, Inc. and Robert Martin Company.

Ruth E. Roth, White Plains, N.Y., pro se.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City (Jay L. Himes, Cameron Clark, Melinda S. Levine and William N. Gerson, of counsel), for respondents Anita Jordan, April Jordan, Latoya Jordan, Anna Ramos, Lizette Ramos, Vanessa Ramos, Gabriel Ramos, Thomas Myers, Lisa Myers, Thomas Myers, Jr., Linda Myers, Shawn Myers, and Nat. Coalition for the Homeless, and Yvonne Jones, Odell A. Jones, Melvin Dixon, Geri Bacon, Mary Williams, James Hodges and Nat. Ass'n for the Advancement of Colored People, Inc., White Plains/Greenburgh Branch.

Grover G. Hankins, NAACP, Inc., Baltimore, Md. (Robert M. Hayes, Virginia G. Shubert, Coalition for the Homeless, Julius L. Chambers, John Charles Boger, Sherrilyn Ifill, Andrew M. Cuomo, New York City, of counsel), for respondents Yvonne Jones, Odell A. Jones, Melvin Dixon, Geri Bacon, Mary Williams, James Hodges and Nat. Ass'n for the Advancement of Colored People, Inc., White Plains/Greenburgh Branch.

## OPINION

GOETTEL, District Judge:

Federalism is a concept whose vitality is perceived by some to be rather fluid. There are those, for example, who believe it worthy only of lip service and that, as a general proposition, if a matter may be brought in *a* court it may be brought in *federal* court. To that thinking, the retort is quite simple: "federal courts are courts of limited jurisdiction." [1] Still others, while cognizant of the notion's existence, perceive its recognition as "seasonal" in nature, going in and out of style with the philosophical predilections of a given administration and the quantity and temperament of its judicial appointments. As to that point of view, we note only that the document serving as federalism's source is entitled to greater deference than the whims of current majoritarian thinking.

There are those, however, who share our view that federalism is a neutral constant of federal jurisprudence, the necessary product of our dualist system. The proceeding before us is rife with federalist implications, and it is our recognition of and respect for those concerns which shapes and guides our handling of the matter.

New York has provided an avenue for judicial review of state and municipal administrative action under N.Y.Civ.Prac.L. & R. ("NYCPLR") §§ 7801–06 (McKinney

1. *Owen Equip. & Erection Co. v. Kroger,* 437 U.S. 365, 374, 98 S.Ct. 2396, 2403, 57 L.Ed.2d 274 (1978).

1981 & Supp.1989), the so-called Article 78 proceeding. Judicial review under these provisions generally is limited to determining whether the official's actions constituted an abuse of discretion, were unsupported by sufficient evidence, or were contrary to existing law. *Id.* at § 7803. Although an Article 78 proceeding cannot be initiated in federal court, *Chicago, Rock Island & Pacific R.R. Co. v. Stude*, 346 U.S. 574, 581, 74 S.Ct. 290, 295, 98 L.Ed. 317 (1954), it is contended that such a proceeding nonetheless may be removed here so long as a federal question is asserted in the Article 78 petition—apparently no matter how tangential or attenuated—or if the respondents allegedly were acting pursuant to federal law protecting equal rights— even if that law parallels similar state law mandating like action.

As will become clear, we harbor certain reservations as to this interest in "federalizing" Article 78 proceedings generally and this proceeding in particular. Fortunately, at least in this case a solution presents itself. Animated chiefly by due respect for the principles of comity and federalism that serve as the essential bedrock for healthy federal-state relations, we find that abstention is proper in this case and, consequently, we remand the matter *sua sponte* to the court from whence it originated and belongs (in our view)—the New York Supreme Court for the County of Westchester.

## I. BACKGROUND

This case, at its core, is unmistakably a product of the "NIMBY Syndrome"—i.e., that syndrome triggered by proposals to locate prisons, public housing, waste facilities, and other such community additions usually perceived by the targeted community as undesirable, the abiding characteristic of which is to ensure that the proposed facility be placed somewhere if it must but "*Not In My BackYard.*" The public project at issue here is the proposed construction of emergency housing for the homeless.

In January of last year, the Town of Greenburgh, in conjunction with the County of Westchester, proposed to build emergency or "transitional" housing to accommodate 108 homeless families on land owned by the County in the Town. The proposed developer is West H.E.L.P., Inc. ("West HELP"), a not-for-profit corporation formed for the express purpose of constructing housing for the homeless of Westchester County. It is generally acknowledged that the vast majority of homeless people who would qualify for residence in the West HELP project are minorities, specifically blacks.

In response to that announcement, a number of Greenburgh residents living in the area immediately surrounding or adjacent to the proposed site formed the Coalition of United Peoples, Inc. ("COUP"). COUP's purpose, de facto or otherwise, is to coordinate opposition to the West HELP project and, most importantly, to ensure that the project is not constructed in COUP's backyard. As part of those efforts, COUP began a drive under N.Y. Village Law §§ 2–200 to 2–258 (McKinney 1973 & Supp.1989) (the "Village Law") to incorporate an area encompassing the proposed West HELP project as a separate village to be denominated the Village of Mayfair Knollwood.[2] On September 14, 1988, pursuant to section 2–202 of the Village Law, COUP presented an incorporation petition to Greenburgh Town Supervisor Tony Veteran, whose responsibility it is in the first instance to determine whether the petition complies with the requirements of the Village Law. In accord with section 2–204 of the Village Law, a public hearing on the matter was conducted on November 1 at which oral testimony was received. Town Supervisor Veteran then adjourned conclusion of the hearing until November 21 for the sole purpose of entertaining written comments on the petition.

---

**2.** Just how incorporation of the proposed village would obstruct construction of housing for the homeless on what is admittedly County-owned property is not entirely clear to us. Presumably, COUP believes that leaders of the newly formed village would be able to so bog down and delay approval of necessary zoning and other permits that pursuit of the project would become undesirable.

Also on November 1, and prior to any decision by Town Supervisor Veteran on the merits of the petition, various citizens of the Town of Greenburgh, a number of homeless people living in Westchester County, the National Association for the Advancement of Colored People, and the National Coalition for the Homeless joined forces as plaintiffs in a federal action in this court against COUP, certain of its members, and Town Supervisor Veteran. *Jones v. Deutsch*, No. 88 Civ. 7738 (GLG). The complaint alleges, *inter alia*, a civil rights conspiracy amongst the named defendants pursuant to 42 U.S.C. § 1985, the ostensible purpose of which is to deprive plaintiffs of voting, housing, and emergency-shelter rights grounded in federal and state law. Plaintiffs also sought a declaratory judgment directing that Town Supervisor Veteran reject the allegedly discriminatory incorporation petition, contending that such a result would be consistent with the proper execution of his oath of office. The COUP defendants moved to dismiss that action on various grounds (among them ripeness and standing). The motion was adjourned *sine die* pending determination of the instant matter, which had been removed to this court during the interim.

Town Supervisor Veteran, apparently not in need of a federal court order controlling his actions, issued a decision on December 1, 1988 rejecting COUP's incorporation petition (the "December 1 Decision"). In a carefully worded opinion, six specific grounds were enumerated as the bases for the decision:

(1) the proposed boundaries are not described with "common certainty," as required by section 2–202 of the Village Law;

(2) the proposed boundaries, where ascertainable, evidence an intent to discriminate and are gerrymandered to exclude black residents, rendering the petition violative of "rights granted by the federal and state constitutions";

(3) the petition was prepared for the invidious purpose of "preventing the con-

struction of transitional housing for homeless families," rendering it violative of "rights granted by the federal and state constitutions";

(4) substantial petition signatures were obtained under false pretenses;

(5) substantial petition signatures are irregular; and

(6) numerous Town residents (particularly newer residents) are not identified as would-be inhabitants of the proposed village, as required by section 2–202 of the Village Law.[3]

Under the express provision of section 2–210 of the Village Law, review of a town supervisor's decision on an incorporation petition may be had only through an Article 78 proceeding on grounds that the decision "is illegal, based on insufficient evidence, or contrary to the weight of evidence." Eleven days after Town Supervisor Veteran issued his decision on the COUP petition, two COUP members instituted an Article 78 proceeding in New York Supreme Court challenging that decision. On January 30 of this year, the respondents in that proceeding filed a petition for removal in the Southern District of New York, designating the matter as related to the pending *Deutsch* action.

Urging that the December 1 Decision be reversed and the petition to incorporate the Village of Mayfair Knollwood be sustained, the Article 78 petition sets forth five specific bases allegedly supporting the relief requested:

(1) since section 2–206(3) of the Village Law requires that testimony offered at a petition hearing "must be in writing" and that the "burden of proof shall be on objectors," and since only oral testimony was taken at the November 1 hearing, Veteran's actions were contrary to the requirements of the Village Law and thus illegal or, alternatively, his decision was not supported by sufficient evidence;

(2) since a town supervisor's authority under section 2–206 of the Village Law to

---

**3.** Principally as a result of that action, an amended complaint was filed in the *Deutsch* action which, *inter alia*, drops defendant Veter-

an as a member of the alleged civil rights conspiracy.

review incorporation petitions allegedly is strictly ministerial (i.e., limited to assessing the validity of only those objections related to petition requirements set forth by the statute), and because the statute does not provide for an examination of or inquiry into the petitioners' intent, Veteran's decision is illegal because it went beyond the scope of his ministerial authority or, alternatively, his perceptions of discriminatory intent are not supported by sufficient evidence;

(3) since under section 2–206 of the Village Law the sole evidence Veteran purportedly was allowed to consider was that adduced at the November 1 public hearing and reduced to writing, his reliance on material received during the period he allowed for further written comment between November 1 through 21 renders his decision illegal or, alternatively, contrary to the weight of the objecting evidence received at the November 1 hearing;

(4) since no objections allegedly were filed with respect to the means by which petition signatures were gathered or as to the sufficiency of the list of regular inhabitants, Veteran's decision is illegal or is unsupported by sufficient evidence; and

(5) since the petitioners' opinions, motives, or intentions are matters allegedly protected by the First Amendment of the United States Constitution, Veteran's decision violates those rights.[4]

Freely expressing our doubt as to the propriety of removal in this case, a conference in chambers was scheduled to discuss, *inter alia,* (i) whether, as a general proposition, Article 78 proceedings may be removed to federal court, (ii) if so, whether removal in this case is justified under either of the pertinent statutory provisions invoked, to be discussed *infra,* and (iii) whether, assuming the instant proceeding can be removed, principles of abstention dictate that we stay our hand or dismiss in deference to a state proceeding addressing some or all of the issues raised.

Memoranda and letters on these subjects were submitted to the court prior and subsequent to the scheduled conference. Generally, all parties are of the belief that the Article 78 proceeding at bar could be and properly was removed, and only counsel for the Article 78 petitioners expressed any concern as to possible abstention implications. In sum, it is readily apparent that the parties are content to be before this court and believe that this court is the proper forum in which to address the Article 78 matter; no motion to remand is contemplated. Notwithstanding this state of affairs, but consistent with the primacy of this court's obligation to protect its jurisdiction, the court has engaged in its own research on the matter. *See Railway Co. v. Ramsey,* 89 U.S. (22 Wall.) 322, 328, 22 L.Ed. 823 (1874) (noting court's authority to remand *sua sponte* if jurisdiction is found lacking); *Cutler v. Rae,* 48 U.S. (7 How.) 729, 731, 12 L.Ed. 890 (1849) (holding consent of parties does not confer federal jurisdiction; it remains "duty of this court to take notice of the want of jurisdiction, without waiting for an objection from either party"). Finding that, even if this proceeding properly was removed, we should abstain pursuant to familiar jurisprudential considerations, we now remand this proceeding *sua sponte. See Corcoran v. Ardra Ins. Co.,* 842 F.2d 31, 36–37 (2d Cir.1988) (holding "that when the district court may properly abstain from adjudicating a removed case, it has the power to remand the case to state court").

## II. DISCUSSION

The right to remove a state case to federal court is, of course, a unique incident to our federalist system with no antecedent at common law. Consequently, removal must be founded upon one of the statutory bases provided by Congress. *Gold–Washing and Water Co. v. Keyes,* 96 U.S. (6 Otto) 199, 201, 24 L.Ed. 656 (1877). The instant petition invokes two such statutory provisions. First, the Article 78 respondents

---

**4.** As discussed *infra,* we add only that it appears certain of the questions bearing on the legality of the procedures employed and whether Veteran exceeded the scope of his authority under the

Village Law are unsettled questions of New York law (indeed, from what we are told by petitioners' counsel, certain of the state questions may be matters of first impression).

contend that removal is warranted under the infrequently utilized "refusal clause" of the civil rights removal statute, 28 U.S. C. § 1443(2). Second, it is contended that the assertion of the First Amendment challenge to the December 1 Decision presents a federal question and warrants removal under the general federal removal statute, 28 U.S.C. § 1441(b). We consider each of these provisions in turn.

### a.  28 U.S.C. § 1443(2)

Respondents devote the lion's share of their argument to the propriety of removal in this case under the refusal clause of the civil rights removal statute. The refusal clause permits removal in those cases where a person acting "under color of authority" is "refusing to do any act on the ground that it would be inconsistent with [federal law providing for equal rights]." Of the precedent that exists construing this awkwardly worded statute, perhaps the two leading decisions were rendered by two of this circuit's most learned and respected jurists.

Certainly, the most complete analysis of the statute provided to date in any circuit is then District Judge Newman's opinion in *Bridgeport Edu. Ass'n v. Zinner*, 415 F.Supp. 715 (D.Conn.1976), which sets out the criteria to be employed in a refusal clause analysis. Generally adopting what he termed Judge Newman's "exhaustive and scholarly review of the subject," now Chief Judge Brieant, sitting by designation and writing for the two-member majority in *White v. Wellington*, 627 F.2d 582 (2d Cir. 1980), succinctly summarized the relevant inquiry: the refusal clause "may be invoked when the removing defendants [state or municipal officials] make a colorable claim that they are being sued for not acting 'pursuant to a state law which, though facially neutral, would produce or perpetuate a racially discriminatory result as applied.'" *Id.* at 586 (quoting *Zinner*, 415 F.Supp. at 722). The statute is exceptional in that it allows the presence of a federal *defense* to control the question of jurisdiction. *Zinner*, 415 F.Supp. at 723 n. 7 (citing *Louisville & Nashville R.R. v.*

*Mottley*, 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908)).

■ Recognizing, we think, that the statute, if left open-ended, could lead to the "federalization" of standard state cases involving challenges to official state or municipal action, an important limitation (consistent with the existing legislative history) has been read into the law's meaning. To state a "colorable claim" under the statute, the removal petition must contain a good faith allegation that there exists a *conflict* between the state law in issue and a federal law protecting equal rights. As Chief Judge Brieant put it, the removal petition must allege "a colorable claim of inconsistent state/federal requirements." *Wellington*, 627 F.2d at 587. *See also Armeno v. Bridgeport Civil Serv. Comm'n*, 446 F.Supp. 553, 557 (D.Conn.1978) (Newman, J.) (noting refusal clause permits removal when official "declined to observe state requirements that he believes are inconsistent with the obligations imposed on him by a federal law protecting equal rights"). The basis of the conflict requirement seems self-evident: without a colorable federal-state conflict, the need to remove to federal court to ensure the proper vindication of superior federal mandates is not manifested. When federal and state interests are compatible, the state court is poised to assure that the defendant's parallel justification for action under state law is given proper consideration. *Cf. Wellington*, 627 F.2d at 590 (Kaufman, J., concurring) (state officials will seek "extraordinary" option of removal under the refusal clause and forego the familiar confines of a state forum "because the federal issue they seek to litigate is so substantial").

Indeed, Judge Meskill, dissenting in *Wellington*, characterized the colorable conflict requirement as the "jurisdictional touchstone" under the refusal clause. *Wellington*, 627 F.2d at 592. The *Wellington* majority concurred with that assessment:

> We agree fully with Judge Meskill's description of the "jurisdictional touchstone" as "a colorable conflict between state and federal law" leading to the

removing defendant's refusal to follow plaintiff's interpretation of state law because of a good faith belief that to do so would violate federal law. That good faith belief is tested objectively, in that the claim to that effect of the removing defendant must be "colorable."

*Id.* at 586–87. Where the majority and dissent parted ways was on what would constitute a "colorable conflict." In that case, the defendants had phrased their removal petition in the alternative; i.e., they contended that they had not violated the applicable state statute or, if it were found that they had, then they acted as they did for to do otherwise would have been inconsistent with the requirements of federal law protecting equal rights. Judge Meskill felt that alternative allegations of this nature did not justify removal under the exceptional provisions of the refusal clause. *Id.* at 591. The majority, however, found "no reason why a removal petition cannot contain inconsistent allegations in the nature, here, of a traditional plea of confession and avoidance without confession," so long as the petition contains "a colorable claim of inconsistent state/federal requirements." *Id.* at 587. Put differently, the contrary nature of state law need not be a matter definitively resolved, so long as the defendant alternatively can assert in good faith a colorable claim of conflict with federal law. *Id.* at 590 (Kaufman, J., concurring).

■ Guided by these holdings, we find that a colorable conflict between federal and state law is neither asserted in the instant petition nor can such a conflict in good faith be found to exist.

As outlined *supra*, Town Supervisor Veteran denied the incorporation petition on six enumerated grounds. Only grounds (2) and (3) implicate federal concerns relating to equal rights; the remaining grounds for denial are largely ministerial in nature, based entirely on the filing requirements of New York's Village Law. Grounds (2) and (3), however, each conclude that even though the Village Law "does not specifically address itself to the 'intent' of the petitioners, I firmly believe that the rights granted by the federal and state constitutions transcend the procedural technicalities set forth in the Village Law." December 1 Decision ¶ 2, at 4; *id.* ¶ 3, at 6. The referenced constitutional protections are not identified in either the December 1 Decision or the removal petition, but it seems plain that the allusions are to the Fourteenth Amendment's command of equal protection.[5] Thus, respondents con-

---

5. Citing only *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), respondents' memorandum notes simply that "Supervisor Veteran relied on federal constitutional protections against race discrimination ... [and] [t]here can be no genuine doubt that these provisions are laws 'providing for equal civil rights.'" Respondents' Conference Memorandum at 9. *See also* Town of Greenburgh's Memorandum at 4 (same). *Gomillion* struck down a gerrymandered plan redefining the boundaries of the City of Tuskegee, Alabama as violative of the Fifteenth Amendment. That amendment provides that the right of citizens to vote shall not be denied on account of race or color. Justice Whittaker, noting that the *Gomillion* plaintiffs were not being denied their right to vote "in the Fifteenth Amendment sense" (i.e., they could still vote, albeit not within the newly defined city limits), concurred in the decision but on grounds that the "fencing out" of black citizens "is an unlawful segregation of races of citizens, in violation of the Equal Protection Clause of the Fourteenth Amendment...." *Id.* at 349, 81 S.Ct. at 131. Although of no moment, we think Justice Whittaker makes a cogent point. More importantly, however, it has been suggested that the Supreme Court has come ultimately to embrace Justice Whittaker's analysis. *See Karcher v. Daggett*, 462 U.S. 725, 748, 103 S.Ct. 2653, 2668, 77 L.Ed.2d 133 (1983) (Stevens, J., concurring) (noting "the Court has subsequently treated *Gomillion* as though it had been decided on equal protection grounds") (citing *Whitcomb v. Chavis*, 403 U.S. 124, 149, 91 S.Ct. 1858, 1872, 29 L.Ed.2d 363 (1971)). *Accord City of Mobile v. Bolden*, 446 U.S. 55, 86–87 & n. 7, 100 S.Ct. 1490, 1509–1510 & n. 7, 64 L.Ed.2d 47 (1980) (Stevens, J., concurring). We will not belabor the reader with citation to a number of Court cases, both majority and concurring opinions, which have cited *Gomillion* in the Fourteenth Amendment context. Suffice it to say that gerrymandering by race, although a Fifteenth Amendment violation under *Gomillion*, certainly falls within the reach of the Equal Protection Clause as well. That additional support could be especially pertinent here since those who would be excluded from the allegedly gerrymandered boundaries of the Village of Mayfair Knollwood would not, unlike the plaintiffs in *Gomillion*, be deprived of their pre-existing right to vote (here, in the Town of

clude, the Village Law, though neutral on its face, would produce a discriminatory result if applied in ignorance of federal constitutional proscriptions, and therein rests the colorable conflict. Respondents' Conference Memorandum at 8–9. Whether or not this is so, however, we believe respondents' argument misses a crucial point.

*Wellington* repeatedly references and requires a conflict between federal and "state law," not *a* state law or statute. The corpus of pertinent "state law" under *Wellington,* it seems to us, must necessarily include state constitutional law, for it is a fundamental maxim of any constitutional society, as New York is, that constitutional mandates govern and delimit legislative and regulatory enactments of the majority. Thus, at least one New York court has noted that incorporation petitions, even if in compliance with the ministerial requirements of the Village Law, will not be sustained if their end is that of advancing racial discrimination. *In re Rose,* 61 Misc. 2d 377, 305 N.Y.S.2d 721, 723 (Sup.Ct.1969), *aff'd mem.,* 36 A.D.2d 1025, 322 N.Y.S.2d 1000 (2d Dep't 1971).[6] Although state law in such a case may be found by resort to the State Constitution, as opposed to the Village Law, it is "state law" nonetheless which forbids the invidious result.

As is made plain by the December 1 Decision, Town Supervisor Veteran relied on both the Federal *and* State Constitutions in rejecting the petition. No conflict between the pertinent federal and state constitutional provisions was perceived by Supervisor Veteran; he acted at the command of *both.* *See especially Wellington,* 627 F.2d at 587 (central inquiry is whether official subjectively believed an actual conflict between federal and state law existed); *id.* at 590 (Kaufman, J., concurring) (same). Nor is any such conflict to be found by reference to existing state law; federal and New York constitutional law governing

equal protection are in harmony. *See Seaman v. Fedourich,* 16 N.Y.2d 94, 262 N.Y. S.2d 444, 450, 209 N.E.2d 778 (1965) (noting New York's equal protection clause, embodied in N.Y. Const. art. 1, § 11, "is as broad in its coverage as that of the Fourteenth Amendment"); *Dorsey v. Stuyvesant Town Corp.,* 299 N.Y. 512, 530, 87 N.E.2d 541 (1949) (holding protection afforded by New York's equal protection clause is coextensive with that granted by Fourteenth Amendment), *cert. denied,* 339 U.S. 981, 70 S.Ct. 1019, 94 L.Ed. 1385 (1950).

The case at bar, therefore, is readily distinguishable from *Cavanagh v. Brock,* 577 F.Supp. 176 (E.D.N.C.1983) (three-judge panel), a case cited by respondents. Removal in that case was permitted under the refusal clause because the removing defendants argued that the relevant provisions of the North Carolina *Constitution,* which were alleged to be in conflict with the Fourteenth Amendment, either had been rescinded or, if in effect, could not be complied with due to the contrary dictates of the Federal Constitution. *Id.* at 179–80. Here, the Equal Protection Clause will embrace whatever discrimination allegedly would have occurred, *supra* note 5, and *Seaman* and *Dorsey* make plain that the corollary state constitutional provision is at least as broad as its federal counterpart. Thus, if Town Supervisor Veteran was required by the Equal Protection Clause of the Fourteenth Amendment to act as he did, he similarly would be required to so act by the equal protection clause of the New York Constitution since the latter is to be read *in pari materia* with its federal relation.

Certainly, notwithstanding Supervisor Veteran's belief that he was complying with state constitutional law, respondents' ability to remove this case under the refusal clause is not lost if the removal petition

---

Greenburgh). *See especially Caserta v. Village of Dickinson,* 491 F.Supp. 500, 506 n. 14 (S.D. Tex.1980) (distinguishing *Gomillion* since excluded plaintiffs retained their pre-existing right to vote; "[t]hose not within the Village of Dickinson boundaries have merely maintained their status quo as members of Galveston Coun-

ty"), *aff'd in relevant part,* 672 F.2d 431, 432–33 (5th Cir.1982).

6. Whether a town supervisor, as opposed to the courts, has authority to make that determination was not discussed in *Rose* and is not addressed here.

contains an allegation based on that belief. Such is the teaching of *Wellington.* Respondents, however, must in good faith be able to plead alternatively that if they were not acting in accordance with state law, then their refusal to so act was the product of conflict between federal and state mandates. *Wellington,* 627 F.2d at 587. No such good faith assertion can be made here. Federal and state law are coextensive in this area. *See also* Fed.R.Civ.P. 11 (requiring that any "pleading, motion, or other paper" submitted to the court and signed by an attorney be grounded in good faith belief that its substance is warranted by facts, law, or good faith argument for the law's modification).

The jurisdictional paragraph of the removal petition acknowledges this reality. *See* Verified Petition for Removal ¶ 11, at 4–5 ("proposed village petition was rejected in part on the basis of federal *and* state Constitutional and statutory provisions providing for equal rights ... [and,] [a]ccordingly, this action may be removed to this Court by respondents pursuant to 28 U.S.C. § 1443(2)") (emphasis added). The petition's conclusion, however, does not state the law. If it did, then in every case challenging state or municipal action relying on federal authority parallelling cited state law, the case could be removed to federal court. This is not the conundrum contemplated by the refusal clause; indeed, it is no conundrum at all. Federal and state law must not merely parallel one another; they must be in conflict (or, more accurately, there must be a good faith allegation of conflict). *See especially In re Quirk,* 549 F.Supp. 1236, 1241 (S.D.N.Y.1982) (refusal clause satisfied since colorable conflict existed between federal court order and New York civil service law); *In re Buffalo Teachers Fed'n,* 477 F.Supp. 691, 694 (W.D. N.Y.1979) (removal under refusal clause

appropriate since "state defendant caught between the conflicting requirements of a Federal [court] order and of state law"); *Zinner,* 415 F.Supp. at 718 (noting refusal clause " 'intended to enable state officers, who shall refuse to enforce state laws discriminating in reference to [civil rights] on account of race or color, to remove these cases to the United States courts when prosecuted for refusing to enforce those laws' ") (quoting Cong.Globe, 39th Cong., 1st Sess. 1115 (1863) (statement of Rep. Wilson)). Contrasted with those scenarios, respondents here are being prosecuted for having acted as they saw fit under the State's equal protection clause, not for having failed to do so, and that provision tracks its federal namesake.

Consequently, we find that there is no colorable conflict between federal and state law in this case, and that removal, if justified here, must be found for reasons other than those provided under the refusal clause.[7]

### b. 28 U.S.C. § 1441(b)

Under 28 U.S.C. § 1441(b), "[a]ny civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the parties." Clearly, the assertion of the First Amendment claim in the petition presents a federal question. We are not so sure, however, that an Article 78 proceeding automatically qualifies as a "civil action" under the removal statute.

The term "civil action" (or the predecessor term "civil suit") has been capaciously defined. Thus, the Supreme Court has opined that appeals from state or municipal administrative action via writ of prohibition or mandamus may qualify for removal:

7. Our decision on the refusal clause might appear gratuitous in light of our holding *infra* that, even if this case was properly removed, principles of abstention warrant a remand. Our ruling on the abstention/remand, however, might be different were we to find that the case could be removed under the refusal clause. Congress's explicit determination that state officials facing the type of federal-state conflict outlined above should be afforded the option of a Federal forum would inevitably color an abstention analysis. Respect for the state interests outlined *infra* might very well have to give way in such a circumstance to the overarching federal concern. Federalism (and respect for it) does, after all, have a federal as well as state component.

The principle to be deduced from [our] cases is, that a proceeding, not in a court of justice, but carried on by executive officers in the exercise of their proper functions, as in the valuation of property for the just distribution of taxes or assessments, is purely administrative in its character, and cannot, in any just sense, be called a suit; and that an appeal in such a case, to a board of assessors or commissioners having no judicial powers, and only authorized to determine questions of quantity, proportion and value, is not a suit; but that such an appeal may become a suit, if made to a court or tribunal having power to determine questions of law and fact, either with or without a jury, and there are parties litigant to contest the case on the one side and the other.

*Upshur County v. Rich,* 135 U.S. 467, 475, 10 S.Ct. 651, 653, 34 L.Ed. 196 (1890). *Accord Commissioners of Road Improvement Dist. No. 2 v. St. Louis S.W. Ry. Co.,* 257 U.S. 547, 557, 559, 42 S.Ct. 250, 254, 255, 66 L.Ed. 364 (1922). *Cf. Weston v. City Council of Charleston,* 27 U.S. (2 Pet.) 449, 464, 7 L.Ed. 481 (1829) (the term "civil suit," in defining Supreme Court's appellate jurisdiction over state cases, is a comprehensive one including various modes of proceeding; so long as an adversary proceeding *inter partes,* it qualifies as a "civil suit").

That said, it is beyond cavil that a statutory appeal of administrative state action, whether or not it involves diverse parties or a federal question, may not be filed in federal court. *Department of Transp. and Dev. of Louisiana v. Beaird-Poulan, Inc.,* 449 U.S. 971, 973–74, 101 S.Ct. 383, 384–85, 66 L.Ed.2d 234 (1980) (Rhenquist, J., dissenting from denial of certiorari) (citing *Stude,* 346 U.S. at 581, 74 S.Ct. at 295). Following from that principle, we doubt

that Congress intended the term "civil action" under the removal statute to be so sponge-like as to allow its absorption of every conceivable type of proceeding involving appeal from state or municipal administrative action which touches upon a federal question. To believe otherwise is to suggest that Congress was ignorant of notions of comity and federalism that are such an important part of our constitutional and jurisprudential fabric. *Cf. St. Louis S.W. Ry.,* 257 U.S. at 554, 42 S.Ct. at 252 ("[a]n administrative proceeding transferred to a court usually becomes judicial, *although not necessarily so* ") (emphasis added).[8]

In New York, an Article 78 proceeding, although admittedly civil in nature, is manifestly circumscribed by the terms of the statute, and it possesses numerous indicia distinguishing it from a typical *inter partes* civil action. It is a self-styled "special proceeding," NYCPLR § 7804(a), designed to supplant the previous writs of certiorari, mandamus, and prohibition, *id.* at § 7801. Consequently, and consistent with the predecessor writs, the scope of review in an Article 78 proceeding is narrowly confined, *id.* at § 7803, and the relief recoverable is limited, *id.* at § 7806. A number of other substantive and procedural irregularities are unique to this form of proceeding. *See especially* NYCPLR § 103 (expressly noting distinction between "civil action" and "special proceeding," and vesting courts with authority to convert a special proceeding into a civil action if nature of claim or relief sought goes beyond confines of the former); J. Weinstein, H. Korn, & A. Miller, *New York Civil Practice* §§ 7801–06 (1988 & Supp. Dec. 1988) (discussing nature of Article 78 proceeding); D. Siegel, *Handbook on New York*

---

**8.** Indeed, the proper application in the modern context of 19th-Century Court precedent defining "civil action" is a matter not free from doubt. Those Courts could not possibly have envisioned the rise of populism, the demise of economic due process, and ultimately the advent of the New Deal, all of which radically changed economic life and governance in this society. Mirroring the federal model produced

by the New Deal, a multitude of administrative agencies now permeate the ranks of state decisionmaking. In that context, we think it a legitimate question to wonder whether the Supreme Court and/or the Congress believe it appropriate to define expansively the term "civil action" so as to allow the universal removal of garden-variety appeals from state administrative action.

*Civil Practice* §§ 557–70 (1978 & Supp. 1988) (same).[9]

Given the unique nature of the action, the fingerprints of federalism inevitably will be so spread upon an Article 78 proceeding that we doubt the proceeding ordinarily can be wiped clean of its essential state administrative character by the mere presence of a federal question, no matter how insignificant, and be rendered removable thereby. Therefore, to permit generally the removal of Article 78 proceedings under 28 U.S.C. § 1441 is, we think, to invite disruption with well-settled notions of comity and federalism. *See, e.g., Crivello v. Board of Adjustment,* 183 F.Supp. 826, 828 (D.N.J.1960) (holding appeal of state administrative action via writ of certiorari, although nominally denominated a "civil action at law," did not constitute a "civil action" as that term is used under the general removal statute); *Collins v. Public Serv. Comm'n of Missouri,* 129 F.Supp. 722, 725 (W.D.Mo.1955) (finding appeal of state administrative action by writ of certiorari to county court "was a mere continuation of the administrative proceeding" and, thus, could not be removed). *But see City of Owatonna v. Chicago, Rock Island & Pacific R.R. Co.,* 298 F.Supp. 919, 922 (D.Minn.1969) (and cases cited therein).[10]

Despite our misgivings, we assume for present purposes that an Article 78 proceeding may be removed under the general removal statute, for our concerns and respect for federalism can be accommodated in this case by the law of this circuit relating to our remand authority. The Supreme Court has held that removed actions generally may not be remanded except within the narrow confines of the remand statute, 28 U.S.C. § 1447(c) (i.e., that the case was removed improvidently or without jurisdiction). *Thermtron Prod., Inc. v. Hermansdorfer,* 423 U.S. 336, 345 & n. 9, 96 S.Ct. 584, 590 & n. 9, 46 L.Ed.2d 542 (1976). The Second Circuit, however, has found a practical exception to that rule, concluding "that when the district court may properly abstain from adjudicating a removed case, it has the power to remand the case to state court." *Corcoran v. Ardra Ins. Co.,* 842 F.2d 31, 36–37 (2d Cir.1988). *Accord Naylor v. Case and McGrath, Inc.,* 585 F.2d 557, 565 (2d Cir.1978). The exception, among other things, is grounded in the reality that no purpose would be served by

**9.** Thus, for example, an Article 78 proceeding is far different from the administrative "appeal" at issue in *Horton v. Liberty Mutual Ins. Co.,* 367 U.S. 348, 81 S.Ct. 1570, 6 L.Ed.2d 890 (1961). The Court there held that a challenge to a Texas administrative determination on a worker's compensation claim could be filed in Federal court as a "civil action" on grounds of diversity, but only because Texas law provides that such a challenge "is not an appellate proceeding[;] [i]t is a trial *de novo wholly without reference* to what may have been decided by the [Texas Industrial Accident] Board." *Id.* at 354–55, 81 S.Ct. at 1573–74 (emphasis added).

**10.** Our conclusion would by necessity be different when removal of an Article 78 proceeding is sought under the refusal clause of 28 U.S.C. § 1443(2), the civil rights removal statute discussed *supra.* Since an Article 78 proceeding is the prescribed avenue of challenge to administrative action in this State, such a proceeding must be removable under the refusal clause if that clause is to be given effect in New York.

Also, there may be times when the federal interest in an Article 78 proceeding may so predominate as to warrant the proceeding's removal under 28 U.S.C. § 1441. Thus, in a series of cases involving appeals to state courts from tobacco quotas imposed by local administrative review committees, federal courts permitted removal under the general removal statute. In those cases, however, the local committees were authorized by federal law and their members were appointed by the United States Secretary of Agriculture, manifesting the obvious federal interest in regulating the tobacco crop. *See Davis v. Joyner,* 240 F.Supp. 689, 690–91 (E.D.N.C.1964) (and cases cited therein). *Cf. Yonkers Racing Corp. v. City of Yonkers,* 858 F.2d 855, 863–64 (2d Cir.1988) (holding removal authorized under All Writs Act, 28 U.S.C. § 1651(a), where real possibility that underlying Article 78 proceeding could be used to frustrate implementation of federal court order designed to remedy racial discrimination in Yonkers), *cert. denied,* — U.S. —, 109 S.Ct. 1527, 103 L.Ed.2d 833 (1989).

Absent special circumstances, however, we remain dubious as to the wisdom of a general rule permitting the removal of Article 78 proceedings. Although several Article 78 proceedings have been removed to courts in this circuit, this specific question has never been addressed. Obviously, it could be argued that the ability to remove such proceedings heretofore simply has been assumed without the need for extended discussion. We are not so sure.

retaining a removed case and then dismissing it on abstention grounds, if applicable, rather than simply remanding the matter to the appropriate state forum. Because the fingerprints of federalism referenced earlier are so clearly discernible here, we find abstention to be appropriate and we thus remand the matter in accord with the remand exception outlined in *Ardra Insurance.*

### c. Abstention

■ Jurisprudential limitations on our jurisdiction long ago announced in *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943) largely control our view of this matter.

*Burford*, of course, involved a challenge to the validity of state administrative action permitting the drilling of certain wells in an east Texas oil field. The legal challenge was initiated in federal court on grounds of diversity and federal question (due process); the case at bar was removed to federal court on the latter basis. In granting dismissal of the *Burford* challenge in the exercise of its equity jurisdiction, the Court noted:

Although a federal equity court does have jurisdiction of a particular proceeding, it may, in its sound discretion, whether its jurisdiction is invoked on ground of diversity of citizenship or otherwise, "refuse to enforce or protect legal rights, the exercise of which may be prejudicial to the public interest" [*United States ex rel. Greathouse v. Dern*, 289 U.S. 352, 360, 53 S.Ct. 614, 617, 77 L.Ed. 1250 (1933)]; for it "is in the public interest that federal courts of equity should exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy." [*Pennsylvania v. Williams*, 294 U.S. 176, 185, 55 S.Ct. 380, 385, 79 L.Ed. 841 (1935).]

*Burford*, 319 U.S. at 317–18, 63 S.Ct. at 1099 (footnotes omitted). Those concerns were found to be present in *Burford*, which involved important state interests (the division of oil-drilling rights) that were the subject of comprehensive state regulation.

The Second Circuit has distilled the principles underlying *Burford* thusly:

[*Burford*] abstention is appropriate when a federal case presents a difficult issue of state law, the resolution of which will have a significant impact on important state policies and for which the state has provided a comprehensive regulatory system with channels for review by state courts or agencies. [*Burford*, 319 U.S.] at 333–34, 63 S.Ct. at 1107–08. In short, federal courts should "abstain from interfering with specialized, ongoing state regulatory schemes."

*Alliance of American Insurers v. Cuomo*, 854 F.2d 591, 599 (2d Cir.1988) (quoting *Levy v. Lewis*, 635 F.2d 960, 963 (2d Cir. 1980)).

In the case at bar, petitioners seek the incorporation of the Village of Mayfair Knollwood, which requires a grant of state authority. N.Y.Const. art. 10, § 1; Village Law § 2–200; 1 E. McQuillen, *The Law of Municipal Corporations* §§ 1.19 & 2.07b (3d ed. 1987) ("*McQuillen*"). As Town Supervisor Veteran alluded to in his December 1 Decision, the legal concept of village incorporation was created to allow residents of a particular area the opportunity to band together for the purposes of securing fire and police protection and other public services, such as water and sewer. December 1 Decision ¶ 2, at 3–4. Given these uniquely local interests, and particularly in an age of increasingly scarce resources (both natural and fiscal), it would seem beyond peradventure that the State of New York retains as profound an interest in certifying village incorporation petitions as does the State of Texas in certifying oil-drilling licenses. *See especially Gomillion*, 364 U.S. at 342, 81 S.Ct. at 127 (recognizing "the breadth and importance" of a State's power "to establish, destroy, or reorganize by contraction or expansion its political subdivisions, to wit, cities, counties, and other local units"); *Hunter v. City of Pittsburgh*, 207 U.S. 161, 176, 178–79, 28 S.Ct. 40, 45, 46–47, 52 L.Ed. 151 (1907) (noting creation of municipal incorporations and definition of their size and na-

ture are matters peculiarly within jurisdiction of the States). *Accord* 1 *McQuillen* § 3.02, at 235; 2 *McQuillen* at §§ 4.03 & 7.03; C. Rhyne, *Municipal Law* §§ 2–2 & 2–26 (1957). Thus, that as a general proposition federal courts should not be muddying the waters in which the village incorporation process swims seems to us an unremarkable and inevitable conclusion.

Further, and acting partly as confirmation of the above state interest, New York has established a "comprehensive regulatory system with channels for review by state courts or agencies," *American Insurers*, 854 F.2d at 599, to assess the propriety of village incorporation petitions:

* the statute specifically identifies what geographic areas may be incorporated as a village, section 2–200 of the Village Law;

* it spells out in elaborate detail who may petition for incorporation and what the contents of the petition must comprise, section 2–202;

* it establishes a public notice and hearing requirement once a petition is filed with a town supervisor, again setting forth in great detail the hearing requirements, section 2–204;

* it specifically notes what objections may be lodged against a village petition, and how and when these objections should be presented, section 2–206;

* it sets forth a specific timetable for action on the petition following hearing, and outlines the prerequisites for the written decision that the town supervisor must issue on the matter, section 2–208;

* it specifically provides that review of a town supervisor's decision may be had only by resort to an Article 78 proceeding on grounds that the "decision is illegal, based on insufficient evidence, or contrary to the weight of the evidence," section 2–210(1);

* it requires that appeal via the Article 78 route must be taken within 30 days from filing of the town supervisor's decision, section 2–210(2), and that such appeal shall have preference over all civil actions and proceedings, section 2–210(4)(e);

* it goes on to delineate the right to and procedures for conducting an election to determine the question of incorporation, sections 2–212 to 2–222;

* it sets forth the procedure for judicial review of an incorporation election, and provides for a new election if the original election is set aside, sections 2–224 to 2–230; and, finally,

* it outlines the formalities of incorporating, the procedures for electing and appointing officers, the conduct of village meetings, the effect on public services, and the taxing authority possessed by the village, sections 2–232 to 2–258.

If this does not constitute a comprehensive statutory scheme, regulating in this case a matter within the fundamental prerogatives of the state, then the court would be hard pressed to identify such a scheme. Certainly, the scheme is as comprehensive and the interest as strong as those existing in *Levy*, where the Second Circuit directed abstention due to New York's "complex administrative and judicial system for regulating and liquidating domestic insurance companies." *Levy*, 635 F.2d at 963. To paraphrase *Burford*, we think the regulation of village incorporations so obviously involves a matter of uniquely state policy that wise judicial discretion counsels in favor of avoiding needless federal intervention in the state's affairs, especially since a comprehensive regulatory scheme to address this matter has been put in place. *Burford*, 319 U.S. at 332, 63 S.Ct. at 1106.

That this proceeding also implicates a federal question does not alter our conclusion. *Burford*, too, involved a federal question but, as the Supreme Court noted, ultimate review of that question before the Court was preserved fully by their action. *Id.* at 334, 63 S.Ct. at 1107. *Accord Levy*, 635 F.2d at 964.

Moreover, the federal question here asserted may never need be reached. Four of the five challenges to the December 1 Decision asserted in the Article 78 petition (claims (1)–(4), delineated *supra*) involve challenges to the propriety of Veteran's

actions under the Village Law.[11] Petitioners' counsel has represented that certain of these questions—particularly those involving the nature of the local hearing to be held on these matters, how and what evidence can be received and relied upon, and the scope of the town supervisor's statutory authority—appear to be matters of unsettled state law. We have found little case law specifically addressing the state issues here raised. If the December 1 Decision is reversed on any of these grounds, the First Amendment assertion will not be reached. When unsettled questions of state law are susceptible of an interpretation which may obviate the federal constitutional question presented, the federal court should defer on these questions—at least in the first instance—to a state tribunal. *Orozco v. Sobol,* 703 F.Supp. 1113, 1121 (S.D.N.Y.1989) (cases collected, including *Railroad Comm'n of Texas v. Pullman,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941)). *See also Levy,* 635 F.2d at 964 (since federal question was bound with state issues, best left in the first instance to state courts with review available ulti-

mately before the Supreme Court). These concerns militate further in support of abstention.[12]

As *Levy* concludes, in words equally applicable here:

The claims [in *Burford* ] amounted to an attack on the reasonableness of the state administrative action. Thus federal review, while involving decision of a federal question, would have entailed a reconsideration of the state administrative decision, carrying with it the potential for creating inequities in the administration of the state scheme. *Burford* thus suggests that proper respect for the expertise of state officials and the expeditious and evenhanded administration of state programs counsels restraint on the part of federal courts.

*Levy,* 635 F.2d at 964. Here, Article 78 review under the Village Law is designed to provide the aggrieved party with the opportunity for expedited and confined judicial review of state administrative action. That review is, in essence, largely an extension of the administrative process itself given the reviewing court's limited scope

11. We add that the existence of these purely state administrative issues places this case in a posture far different from that found in *Gomillion* and cases like it, which constitute straight constitutional challenges to gerrymandered municipal boundary plans devised upon conclusion of the legislative or administrative drafting processes. Had the instant incorporation petition been approved under the Village Law, and the *Deutsch* plaintiffs (assuming they had standing) then challenged that action in federal court on Fourteenth Amendment grounds, we have little doubt that we properly would have jurisdiction over the subject matter and that plaintiffs' choice of a federal forum would be respected. That is not the posture of this case.

12. The Supreme Court has observed that the "various types of abstention are not rigid pigeonholes into which federal courts must try to fit cases. Rather, they reflect a complex of considerations designed to soften the tensions inherent in a system that contemplates parallel judicial processes." *Pennzoil Co. v. Texaco, Inc.,* 481 U.S. 1, 107 S.Ct. 1519, 1526 n. 9, 95 L.Ed.2d 1 (1987). Thus, although this case is governed largely by *Burford* considerations, the existence of *Pullman* concerns certainly is relevant. Notwithstanding *Pennzoil*'s footnote 9, however, there do exist important procedural differences between the "various types of abstention." Pertinent here, we note that the product of *Burford* abstention is dismissal, while under *Pullman*

federal and state issues may be bifurcated, with the federal court retaining jurisdiction over the former and the litigants allowed the option of returning to that forum to address the federal concerns following state review. *England v. Louisiana State Bd. of Medical Examiners,* 375 U.S. 411, 421–22, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964). *But see Harris County Comm'rs Court v. Moore,* 420 U.S. 77, 88 & n. 14, 95 S.Ct. 870, 877 & n. 14, 43 L.Ed.2d 32 (1975) (dismissal in *Pullman* case appropriate if necessary to remove obstacles to state court jurisdiction). It makes no sense to bifurcate the federal and state issues in this case, especially since to do so would potentially frustrate the Village Law's scheme of providing for complete and expeditious review of incorporation petitions. Further, consistent with the service requirements of section 2–210(4)(b) of the Village Law, the costs of bringing a new Article 78 proceeding to address solely state issues would be substantial (given the number of parties involved), arguably rendering that "solution" inequitable. Since *Burford* concerns predominate in the instant proceeding, we choose to keep the proceeding whole and remand the entire matter to state court which, as was emphasized in both *Burford* and *Levy,* is entirely competent to address the First Amendment issue asserted here (if it need be reached).

and remedial authority, and it is that forum which should be deciding the state issues which predominate in this matter. If federal questions are implicated in that process and improperly are decided, ultimate review before the Supreme Court is preserved. Abstention, therefore, is warranted here.

### Conclusion

Assuming the general removability of Article 78 proceedings, the instant matter involves a federal question and may be removed pursuant to 28 U.S.C. § 1441(b). Consistent with *Ardra Insurance*, however, and because we would abstain from deciding the issues here presented under familiar jurisprudential considerations, the instant proceeding is remanded to the court from whence it was removed, the New York Supreme Court for Westchester County.

SO ORDERED.