Yvonne JONES, Anita Jordan, April Jordan, Latoya Jordan, Anna Ramos, Lizette Ramos, Vanessa Ramos, Gabriel Ramos, Thomas Myers, Lisa Myers, Thomas Myers, Jr., Linda Myers, Shawn Myers, Stacey Franklin, Chanelle Franklin, Ronald Franklin, Janet Llanos, Eric Steven Llanos, Odell A. Jones, Melvin Dixon, Geri Bacon, Mary Williams, James Hodges, National Association for the Advancement of Colored People, Inc., White Plains/Greenburgh Branch, and National Coalition for the Homeless, Plaintiffs,

v.

Laurence DEUTSCH, Colin Edwin Kaufman, Steven Neil Goldrich, Michael James Tone, Coalition of United Peoples, Inc., and Anthony F. Veteran, as Supervisor of the Town of Greenburgh, Defendants.

No. 88 Civ. 7738 (GLG).

United States District Court,
S.D. New York.

June 28, 1989.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City (Jay L. Himes, Cameron Clark, Melinda S. Levine and William N. Gerson, of counsel), for plaintiffs Anita Jordan, April Jordan, Latoya Jordan, Anna

Ramos, Lizette Ramos, Vanessa Ramos, Gabriel Ramos, Thomas Myers, Lisa Myers, Thomas Myers, Jr., Linda Myers, Shawn Myers, Stacey Franklin, Chanelle Franklin, Ronald Franklin, Janet Llanos, Eric Steven Llanos, and Nat. Coalition for the Homeless, and Local Counsel for the remaining plaintiffs.

Grover G. Hankins, N.A.A.C.P., Inc., Baltimore, Md. (Robert M. Hayes and Virginia G. Shubert, Coalition for the Homeless, Julius L. Chambers, John Charles Boger, Sherrilyn Ifill and Andrew M. Cuomo, New York City, of counsel), for plaintiffs Yvonne Jones, Odell A. Jones, Melvin Dixon, Geri Bacon, Mary Williams, James Hodges, N.A.A.C.P., Inc., White Plains/Greenburgh Branch.

Lovett & Gould, White Plains, N.Y. (Jonathan Lovett, of counsel), for defendants Deutsch, Tone, Goldrich, and Coalition of United Peoples, Inc.

Quinn & Suhr, White Plains, N.Y. (Timothy C. Quinn, Jr., of counsel), for defendant Colin Edwin Kaufman.

## OPINION

GOETTEL, District Judge:

In January of 1988, leaders from the Town of Greenburgh threw their support behind a county proposal to build emergency or "transitional" housing for the homeless on a 30-acre site in the town owned by the County of Westchester. The current design calls for the construction of six two-story buildings, each comprising some 18 units of housing, with a seventh building to be used for administrative support, day care, and skills training.

In response thereto, a number of residents owning property surrounding the proposed site formed the Coalition of United Peoples, Inc. ("COUP"), whose purpose, de facto or otherwise, is to prevent or substantially modify the housing project. As part of those efforts, COUP members sought to secede from the Town of Greenburgh by incorporating as a separate community to be denominated the Village of Mayfair Knollwood. Pursuant to the provisions of N.Y. Village Law §§ 2–200 to 2–258 (McKinney 1973 & Supp.1989), an incorporation petition was presented to Greenburgh Town Supervisor Anthony Veteran. Following a public hearing, Town Supervisor Veteran rejected the petition on various constitutional and statutory grounds outlined in a decision dated December 1, 1988 (the "December 1 Decision"). Among other things, Town Supervisor Veteran concluded that the proposed "boundaries, where ascertainable, were gerrymandered in a manner to exclude black persons from the proposed village" and that the petition also would "racially discriminate against homeless persons who are predominantly black." December 1 Decision ¶ 2, at 2 and ¶ 3, at 7. Two COUP members then appealed that decision to New York Supreme Court in an Article 78 proceeding,[1] which action subsequently was removed to this court by the respondents. Concluding that we would abstain from adjudicating the Article 78 proceeding under familiar doctrine finding its origins in *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943) and *Railroad Comm'n of Texas v. Pullman*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), we remanded the matter, *sua sponte*, to State court. *In re Greenberg*, 710 F.Supp. 962, 972–976 (S.D. N.Y.1989). Town Supervisor Veteran appealed and is seeking a stay of the remanded Article 78 proceeding pending decision by the Second Circuit.

The *Greenberg* respondents argued to us, in essence, that if the statutory scheme regulating village incorporation is allowed to proceed in this case, it should be a Federal court that presides over that process due to the implication of various federal questions. We disagreed. The *ratio decendi* of our decision was that, in the absence of conflicting federal-state mandates imposed on State or municipal officials concerning the protection of equal rights, the comprehensive political/regula-

---

**1.** *See* N.Y.Civ.Prac.L. & R. §§ 7801–06 (McKinney 1981 & Supp.1989). Under N.Y. Village Law § 2–210 (McKinney 1973 & Supp.1989), an Article 78 proceeding statutorily is prescribed as the avenue for appeal of a town supervisor's decision rejecting an incorporation petition.

tory process created by New York to govern village incorporation should be allowed to work its will given the State's manifest and overriding interest in such matters. We emphasized, however, that should that process fail to serve the people in a color-blind fashion, the Federal courts would be there to ensure the vindication of federally protected rights. *See Greenberg,* 710 F.Supp. at 974–975 n. 11 (noting that "[h]ad the instant incorporation petition been approved under the Village Law, and the *Deutsch* plaintiffs [plaintiffs in the instant action] (assuming they had standing) then challenged that action in federal court on Fourteenth Amendment grounds, we have little doubt that we properly would have jurisdiction over the subject matter and that plaintiffs' choice of a federal forum would be respected"). Until that time, however, we continue to believe that Federal intervention in the incorporation process is both premature and imprudent and would undermine sound notions of comity and federalism.

Plaintiffs in this case (many of whom are respondents in the Article 78 proceeding) seek to go one step further by, in essence, preempting the village incorporation process altogether. Charging COUP with leadership of a conspiracy to violate civil rights, plaintiffs seek, *inter alia,* a permanent injunction restraining COUP from continuing with their heretofore unsuccessful incorporation efforts. Until the incorporation petition receives some form of State approval under the Village Law, however, the harms plaintiffs seek to prevent— alleged discriminatory violations of their voting and housing rights—cannot be realized.[2]

Moreover, to issue the injunction sought by plaintiffs, an evidentiary hearing to as-

sess discriminatory intent/impact undoubtedly would be required. Given the present posture of this matter, we could very well be holding a lengthy and expensive evidentiary hearing on an incorporation petition that will *never* be put before the voters. Such a premature and potentially wasteful exercise of Federal judicial resources cannot be countenanced.

Understandably, lawyers, like anyone, would prefer to do battle on familiar turf— in their case, the courts. But this lawyerly penchant for prematurely bringing local political battles into Federal court cannot help but erode our legitimacy and authority in the eyes of the citizens and Constitution we serve if it is given effect. Simply put, we feel no differently now than when we issued our remand decision: the process established by the State to regulate village incorporation should and must be given a chance to work. Indeed, given the result thus far obtained—rejection of the petition, the principal result sought by this complaint—it is hard to fathom why plaintiffs harbor so little faith in the political process they seek to enjoin. Nonetheless, as we have made clear, the doors to Federal court will be wide open should the political process ultimately work an unconstitutionally discriminatory result. *In re Greenberg,* 710 F.Supp. at 974–975 n. 11.

Given these concerns, it should not be surprising that we believe this action to be both procedurally and substantively premature unless and until the State acts to give effect to COUP's efforts, and we dismiss the complaint as a result.

## I. THE FIRST AMENDED COMPLAINT

The original complaint in this action was filed prior to the December 1 Decision rejecting the incorporation petition. Follow-

---

**2.** Before the incorporation can take effect, the petition must be approved by the town supervisor (who has been delegated the authority by the State to provide the initial review of incorporation petitions), survive challenge in the State courts via the Article 78 process, be ratified by a majority of would-be residents of the proposed village, and survive challenge to the election in state court. N.Y. Village Law §§ 2–208, 2–210, 2–222, & 2–224 (McKinney 1973 & Supp.1989). If that approval is secured, the

Secretary of State then issues a certificate of incorporation. *Id.* at § 2–234. We add that "the restraints imposed by the Constitution on the States [cannot] be circumvented by local bodies to whom the State delegates authority." *Sailors v. Board of Edu.,* 387 U.S. 105, 108 n. 5, 87 S.Ct. 1549, 1552 n. 5, 18 L.Ed.2d 650 (1967). Consequently, throughout our remand decision and here we treat the town supervisor, at least when exercising authority under the Village Law, as an agent of the State.

ing that action, plaintiffs were granted leave to file a first amended complaint ("FAC"), which is the subject of the instant motions. The pertinent facts underlying this action are detailed more completely in our remand decision, *In re Greenberg*, 710 F.Supp. at 964–966, familiarity with which is presumed.

The plaintiffs are comprised of two groups: (i) a number of black individuals who either live in Greenburgh and would be affected by approval of the allegedly gerrymandered incorporation petition or who live in Westchester County and would supposedly qualify for residence at the proposed housing project (the "individual plaintiffs"); and (ii) the National Association for the Advancement of Colored People, Inc., White Plains/Greenburgh Branch (the "NAACP") and the National Coalition for the Homeless (the "institutional plaintiffs"). The defendants are COUP and four of its leaders (the "COUP defendants") and Town Supervisor Veteran.

Based on COUP's allegedly discriminatory efforts to incorporate the Village of Mayfair Knollwood, FAC ¶ 1, at 1–2, four counts are presented in the complaint:

*count I*—the COUP defendants, in violation of 42 U.S.C. § 1985(3) ("section 1985(3)"), have conspired and are continuing to conspire to abridge the voting rights of certain of the individual plaintiffs by gerrymandering in a racially discriminatory fashion the proposed boundaries of the Village of Mayfair Knollwood;[3]

*count II*—the COUP defendants have conspired and are continuing to conspire in violation of section 1985(3) to violate the housing rights of those individual plaintiffs now homeless;[4]

*count III*—the COUP defendants have conspired and are continuing to conspire in violation of section 1985(3) to violate the emergency-shelter rights possessed by those individual plaintiffs now homeless;[5]

*count IV*—this count is asserted solely against defendant Veteran, and it seeks a judgment declaring that Veteran possesses the authority under the Federal and State Constitutions, consistent with his oath of office, to reject the COUP incorporation petition.[6]

In addition to compensatory damages and attorney's fees, plaintiffs seek "entry of a permanent injunction restraining the [COUP] Defendants from continuing their unlawful conspiracy, including, but not limited to, pursuing any further proceedings with respect to the Petition to incorporate the proposed Village of Mayfair Knollwood." FAC at 25. Our jurisdiction is premised on the bases of the asserted federal claims.

The individual plaintiffs allege standing sufficient to maintain this action on grounds that (i) they are being denied or threatened with denial of their voting and housing rights, FAC ¶ 52(a) & (b), at 20,

---

**3.** The substantive violations comprising this count are alleged violations of U.S. Const. amend. XV; section 2 of the Voting Rights Act, 42 U.S.C. § 1973; N.Y. Const. art. I, §§ 1 & 11; and N.Y.Civ. Rights Law § 40–c (McKinney Supp.1989). The NAACP joins this count on its own behalf and on behalf of its members.

**4.** The substantive violations comprising this count are alleged violations of the U.S. Const. amend. XIV; section 804 of the Fair Housing Act, 42 U.S.C. § 3604; N.Y. Const. art. I, § 11; *id.* at art. XVII, § 1; N.Y.Civ. Rights Law § 40–c (McKinney Supp.1989); and N.Y.Exec.Law § 291(2) (McKinney 1982). The NAACP joins this count on its own behalf and on behalf of its members. The National Coalition for the Homeless joins this count on its own behalf and on behalf of the homeless of Westchester County.

**5.** The substantive violations comprising this count are alleged violations of the U.S. Const. amend. XIV; 42 U.S.C. §§ 601 & 602; N.Y. Const. art. I, § 1; *id.* at art. XVII, § 1; N.Y.Soc. Serv.Law §§ 62(1) & 131 (McKinney 1983 & Supp.1989). The National Coalition for the Homeless joins this count on its own behalf and on behalf of the homeless of Westchester County.

**6.** Town Supervisor Veteran was included in the original complaint as a member of the alleged civil rights conspiracy. One of the key changes embodied in the FAC, as a result of the December 1 Decision, is the deletion of Veteran from the section 1985(3) counts.

and (ii) they "are being denied the benefits of association, residence, interaction and other contact arising from living in a community that is free from discrimination on account of race or homelessness," FAC ¶ 52(c), at 20. The institutional plaintiffs allege standing on the basis that their basic goals are being thwarted by the COUP conspiracy and that in response thereto these groups have had to divert institutional resources. FAC ¶ 52(d), at 20–21.

The COUP defendants move to dismiss the complaint on various grounds, including lack of a justiciable question, standing, and subject matter jurisdiction.[7] In addition, they seek an award of attorney's fees under 42 U.S.C. § 1988 or sanctions pursuant to Fed.R.Civ.P. 11. Upon removal of the Article 78 proceeding, these motions were adjourned *sine die* pending our decision as to whether removal of the Article 78 petition was appropriate. Upon issuance of our remand decision, the instant motions were scheduled for oral argument, and are now ready for decision.[8]

## II. DISCUSSION

If a ripe and cognizable claim embodying the kind of injunctive relief sought herein could be asserted, and if these plaintiffs had standing to bring such a claim, a strong argument could be made that we should stay our hand, for to do otherwise would potentially allow this action to work an end run on the pending Article 78 proceeding. These concerns do not present

themselves, however, because we find that the FAC does not contain the stuff of a ripe and cognizable federal claim.

### (a) Ripeness

■ The COUP defendants move broadly to dismiss due to lack of a justiciable question. Justiciability is a term of art embracing the constitutional and related jurisprudential limitations placed upon the jurisdiction of Federal courts. *See generally Flast v. Cohen,* 392 U.S. 83, 94–97, 88 S.Ct. 1942, 1949–1951, 20 L.Ed.2d 947 (1968). It is an umbrella-like term which finds beneath its cover the various doctrines that shape and define our authority to act in particular cases: ripeness, standing, mootness, advisory opinion, and political question. Although ripeness and standing virtually transect one another in this case, it is our view that this matter is not ripe and must be dismissed.

The ripeness doctrine is designed to ensure that a dispute has "matured to a point that warrants decision." 13A C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* § 3532, at 112 (2d ed. 1984) [hereinafter *"Wright, Miller, and Cooper"*]. Determining whether that point has been reached "turns on 'the fitness of the issues for judicial decision' and 'the hardship to the parties of withholding court consideration.'" *Pacific Gas & Elec. Co. v. State Energy Resources Conservation and Dev. Comm'n,* 461 U.S. 190, 201, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752 (1983)

---

**7.** Defendant Colin Edwin Kaufman, a COUP member, is represented by separate counsel and he moves individually for dismissal or, alternatively, for summary judgment. We treat his motion as part of the motion to dismiss made by the other COUP defendants.

**8.** Defendant Veteran has not joined in these motions to dismiss, undoubtedly for his own strategic reasons. In a benign sense, he presumably wants this matter resolved as quickly as possible in whatever forum. In a more Machiavellian sense, a Federal court order declaring that Veteran had to do what he did in the December 1 Decision undoubtedly would help relieve whatever political pressure he may be feeling. In any event, because he has not moved to dismiss, count IV of the FAC is not addressed by this decision and, at least temporarily, is left intact. The parties can be sure,

however, that notwithstanding their collective wishes, the court will *sua sponte* if necessary seek briefing on dismissal issues if they intend to press forward with count IV. For example, given the apparent identity of interests between these parties, count IV might fairly be considered collusive or, at minimum, lacking in concrete adverseness. *See generally* C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* ¶ 3530 (2d ed. 1984). In addition, as plaintiffs' counsel concedes, "the Article 78 proceeding and [count IV] here are [simply] two sides of the same coin." Plaintiffs' Brief, at 17. A further question is raised, therefore, as to the appropriate exercise of our jurisdiction under *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and/or *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976).

(quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967)). Neither prong of this formula is satisfied here.[9]

The alleged conspiracy is designed to abridge voting, housing, and emergency-shelter rights purportedly guaranteed by federal and state law. The vehicle chosen, however, to accomplish these pernicious ends—incorporation of the Village of Mayfair Knollwood—is not now and may never be a reality. To the contrary, the incorporation petition has been rejected by Town Supervisor Veteran.

Plaintiff contends, nonetheless, that we need not wait for life to be breathed into this Frankenstein monster, if a monster it is, before acting to protect established rights. As a general proposition, we do not disagree with this contention. " 'One does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is *certainly impending,* that is enough [to prevent dismissal on ripeness grounds].' " *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 143, 95 S.Ct. 335, 358, 42 L.Ed.2d 320 (1974) (emphasis added) (quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 593, 43 S.Ct. 658, 663–664, 67 L.Ed. 1117 (1923)). *See also Lake Carriers' Ass'n v. MacMullen*, 406 U.S. 498, 506, 92 S.Ct. 1749, 1755, 32 L.Ed.2d 257 (1972) (noting ripeness question centers on whether controversy is " 'of *sufficient immediacy and reality* to warrant' " relief) (emphasis added) (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941)). We do not agree with plaintiffs that the end of this conspiracy is sufficiently "impending" or that the controversy is of such "immediacy and reality" as to warrant the relief here sought.

As to the deprivation or dilution of voting rights, that claim is based on a number of contingencies that have not yet occurred. As outlined *supra* note 2, before a certification of village incorporation will be issued by the State an incorporation petition must be certified by the town supervisor, survive challenge via an Article 78 proceeding, be approved by a majority of the would-be voting residents of the proposed village, and survive court challenge to the electoral process utilized. The instant petition has not even cleared the first of these hurdles.

Obviously, it is conceivable that the December 1 Decision will be reversed by the New York courts during the Article 78 proceedings. Although *conceivable,* we think the possibility far too speculative and of insufficient immediacy and reality as to render this action fit for judicial decision. Among other things, the December 1 Decision sets forth six separate bases, some constitutional (both Federal and State) and some statutory, as reasons for Town Supervisor Veteran's action. *See In re Greenberg*, 710 F.Supp. at 965. If any *one* of these grounds for rejection are affirmed, then the COUP petition will fail. Thus, not only does this case rest on a hypothetical reversal of the December 1 Decision by the New York courts, but reversal will occur only if *all six* of the grounds stated by Town Supervisor Veteran are found to be infirm. That we find this possibility to be too removed to justify intervention by a Federal court should not be surprising.[10]

This case, therefore, is strikingly dissimilar from the leading Supreme Court deci-

---

**9.** Although the *Abbott Laboratories* test was articulated in a case challenging administrative action, these same concerns inform analysis in a non-administrative context as well. *Poe v. Ullman*, 367 U.S. 497, 508–509, 81 S.Ct. 1752, 1758–1759, 6 L.Ed.2d 989 (1961).

**10.** Moreover, certain of the challenges raised by the Article 78 petitioners are based on contentions that the December 1 Decision is unsupported by sufficient evidence and that the proceedings held by Town Supervisor Veteran did not comport with the statutory requirements. *Id.* at 6–8. If these claims are proven, an option seemingly available to the New York courts would be remand of the petition to Town Supervisor Veteran for further, corrected proceedings. J. Weinstein, H. Korn, & A. Miller, *New York Civil Practice* ¶ 7806.01, at p. 78–145 (1988). Thus, although the Article 78 petitioners have sought reinstatement of the petition, that need not be the necessary product of reversal. Consequently, even if the reversal feared by plaintiffs occurs, the conclusion that the allegedly ·discriminatory petition will then become a reality remains too attenuated.

sion cited as the linchpin of plaintiffs' voting rights claims. In *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), plaintiffs sought to enjoin operation of a statute enacted by the Alabama Legislature which gerrymandered (in a racially discriminatory fashion) the boundaries of the City of Tuskegee. The Court held that an injunction would be appropriate, but the case clearly was ripe for decision—the Alabama Legislature had passed the offending statute and the resulting gerrymander, therefore, certainly was impending. *Id.* at 340, 81 S.Ct. at 126.

■ As to the threatened deprivation of housing and emergency-shelter rights, these claims depend initially upon the success of the currently rejected incorporation effort and then upon the occurrence of certain additional events. If the gerrymander/voting rights claims growing from the derailed petition effort are not yet ripe, it follows *a fortiori* that the housing claims are premature.[11]

■ In arguing that this matter is fit for judicial intervention, plaintiffs cite four cases in which Federal courts acted to enjoin allegedly discriminatory secessionist movements that threatened to frustrate existing school desegregation orders. Although ripeness was not addressed specifically in any of these decisions, in each case either the secession being challenged had been approved or some other event had occurred which rendered the possibility of secession sufficiently impending. *See United States v. Scotland Neck City Bd. of Edu.*, 407 U.S. 484, 486–487, 92 S.Ct. 2214, 2215–2216, 33 L.Ed.2d 75 (1972) (state statute authorizing creation of new school district had been approved and residents subsequently had ratified ballot referendum effecting that purpose); *Wright v. Council of Emporia*, 407 U.S. 451, 454–459, 92 S.Ct. 2196, 2199–2201, 33 L.Ed.2d 51 (1972) (new city already formed and steps taken by it to withdraw its students from desegregated school district and create its own independent district); *Lee v. Macon County Bd. of Edu.*, 448 F.2d 746, 749, 752 (5th Cir.1971) (incorporation of independent school district had occurred); *Burleson v. County Bd. of Election Comm'rs*, 308 F.Supp. 352, 353–354 (E.D.Ark.) (incorporation petition had been certified and election approving secession had occurred), *aff'd*, 432 F.2d 1356 (8th Cir.1970) (per curiam).[12] These cases are distinguishable from the instant facts where there has been neither certification of the incorporation petition nor an election approving incorporation.

Plaintiffs insist that we need not wait for those steps to occur before acting, citing additionally and primarily two cases in which Federal courts enjoined ballot referenda that the courts viewed as unconstitutional. *Holmes v. Leadbetter*, 294 F.Supp. 991 (E.D.Mich.1968); *Otey v. Common Council of Milwaukee*, 281 F.Supp. 264 (E.D.Wis.1968). The rationale underpinning these cases is that courts need not wait for voter approval of a referendum question that would clearly and palpably violate the Federal or State Constitution. *Otey*, 281 F.Supp. at 276. Such a vote, it is argued, would be nothing but "an exercise

---

11. There is yet a further, fundamental difficulty underlying the exercise of our jurisdiction in this case. In crafting injunctive relief, this court must be very specific in delineating what precisely is being enjoined. Although we could conceivably enjoin pursuit of the incorporation petition as it was submitted, assuming its discriminatory purpose or impact, the practical effect of that relief could prove limited should COUP or a similar group of citizens decide to initiate a second incorporation petition. So long as the second petition was substantially different from the first in its geographical makeup, our injunction would in all probability not apply. In reality, what plaintiffs really want is an injunction barring COUP or its members from opposing the housing project, and such an injunction would clearly be overbroad and beyond the power of this court to approve.

12. For similar reasons, other cases plaintiffs cite for analogous authority are unavailing. *See Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 928, 941 (2d Cir.1988) (town board had already denied petition to amend discriminatory zoning regulation), *aff'd*, — U.S. —, 109 S.Ct. 276, 102 L.Ed.2d 180 (U.S. 1988) (per curiam); *United States v. City of Black Jack*, 508 F.2d 1179, 1188 (8th Cir.) (town board had adopted discriminatory zoning ordinance), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975).

in futility." *Holmes*, 294 F.Supp. at 996. Whether a Federal court properly may enjoin a scheduled ballot referendum is a matter we need not pass upon, for the petition here has not been approved by the town supervisor. Consequently, an election is neither scheduled nor imminent. This circumstance contrasts sharply with those extant in both *Holmes* and *Otey*. In each case, for reasons statutory or otherwise, the city council had passed the proposed referendum along to the voters; the councils, in essence, had "certified" the question. *Holmes*, 294 F.Supp. at 992 & nn. 2–3; *Otey*, 281 F.Supp. at 266–267 & n. 1. The referenda in those cases were then scheduled for a vote, and no changes or modifications of the questions could be effected at that point; the sole remaining step was an up or down vote by the voters.[13] The petition at issue, to be certified to the voters, must be approved by the town supervisor and survive challenge via an Article 78 proceeding. Numerous possibilities for change or modification of the ultimate petition presented to the voters, if one is ever presented at all, exist. The fact that this petition has not yet been certified to the voters, therefore, distinguishes this case and renders the *Holmes* and *Otey* logic inapposite. Simply put, the claims against the COUP defendants involve " 'contingent future events that may not occur as anticipated, or indeed may not occur at all.' " *Thomas v. Union Carbide Agric. Prod. Co.*, 473 U.S. 568, 580–581, 105 S.Ct. 3325, 3332–3333, 87 L.Ed.2d 409 (1985) (quoting 13A *Wright, Miller, & Cooper* § 3532, at 112).[14]

**13.** The other cases cited by plaintiffs on this point are to the same effect. *See, e.g., Aytch v. Mitchell*, 320 F.Supp. 1372, 1373–1374 (E.D.Ark. 1971); *Ellis v. Mayor of Baltimore*, 234 F.Supp. 945, 946–947 (D.Md.1964), *aff'd*, 352 F.2d 123 (4th Cir.1965).

**14.** We underscore additionally that, notwithstanding *Holmes* and *Otey*, we do not pass upon the propriety of court intervention prior to a scheduled vote on an incorporation petition. As New Yorkers should well know in light of Governor Thomas Dewey's "upset loss" in the 1948 presidential election, no vote is certain. We think voters can comprehend constitutional arguments made in the context of a referendum campaign, and preempting voters from making

In addition to assessing the fitness of the issue for judicial determination, *Abbott Laboratories* requires that we consider the hardships that would inure should we decline to act at this time. Frankly, we see none—or at least none that would justify intervention now. Should the incorporation petition be certified (and, if required, voter approval be obtained), any party with standing may seek at that time to enjoin the secession and, if that party can meet the requirements for an injunction, prevent whatever imminent harm is threatened.

The only "hardships" certain of these plaintiffs are enduring are the costs incurred in opposing the petition politically and/or as respondents in the underlying Article 78 proceeding. These are the normal costs we as a society are prepared to recognize as a consequence of the democratic and statutory processes implicated here; they are not the kind of "hardships" that would militate in favor of court intervention in what is an otherwise premature action.

In that context, we note that, especially when assessing the hardships resulting from judicial inaction, the ripeness and standing doctrines tend to merge. *See Warth v. Seldin*, 422 U.S. 490, 499 n. 10, 95 S.Ct. 2197, 2205 n. 10, 45 L.Ed.2d 343 (1975) (noting "standing question thus bears close affinity to question[ ] of ripeness"); *Abbott Laboratories*, 387 U.S. at 153–154, 87 S.Ct. at 1517–1518 (discussing sufficiency of plaintiffs' standing in determining whether, as matter of ripeness, hardships warranted court action); *accord* 13 *Wright, Miller, &*

an electoral judgment on that score is a course to be traversed most warily it seems to us. Nor do we perceive the question to be as closed as plaintiffs suggest. *See, e.g., Burleson*, 308 F.Supp. at 353 (a case cited in plaintiffs' own brief whereby court enjoined creation of independent school district on grounds it threatened to undermine desegregation order, but did so only *after* voter approval of secession petition *at an election the court previously declined to enjoin* ). Thus, it may well be (although we do not decide the matter) that before this case ripens for adjudication the incorporation petition will not only have to be certified for a vote but an election approving the petition must also have taken place.

*Cooper* § 3529, at 289; *id.* § 3531.4, at 437. We add, therefore, that the injuries alleged in the FAC, outlined *supra,* are not persuasive in justifying judicial action at this time.

■ As to the individual plaintiffs, the claimed "denial" of voting and housing rights is not material; no one has yet been *denied* any thing or any rights (except, of course, COUP, whose incorporation petition has been denied). As to the *"threatened* denial" of these rights, the injury alleged is too remote and speculative to support standing given the contingencies outlined above. *See Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 44, 96 S.Ct. 1917, 1927, 48 L.Ed.2d 450 (1976) (holding "unadorned speculation will not suffice" to confer standing). In seeking analogous support for its position, plaintiffs at oral argument generally referenced a case involving hazardous fire conditions at a prison facility in which prisoners were found to have standing to challenge those conditions. Such were the facts and holding of *DiMarzo v. Cahill,* 575 F.2d 15, 18 (1st Cir.), *cert. denied,* 439 U.S. 927, 99 S.Ct. 312, 58 L.Ed.2d 320 (1978), which concluded: "One need not wait for the conflagration before concluding that a *real and present threat* exists." (Emphasis added.) We have no quarrel with this holding; indeed, a contrary holding requiring that prisoners first be burned before they could demonstrate standing to challenge hazardous conditions would render the threatened injury component of standing a nullity (and absurdity). *DiMarzo* is far removed from the facts before us, however. At least until the incorporation petition is certified, and perhaps until voter approval also has been obtained, plaintiffs' claims of threatened harm are too imaginary to support standing.

■ Finally, their claim of alleged psychic and emotional injury resulting from the deprivation of benefits that inure with living in a discrimination-free environment is particularly troubling. It is true that the Supreme Court has held that Congress intended the loss of benefits from interracial association to be sufficient injury to confer standing under the Fair Housing Act. *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 209–212, 93 S.Ct. 364, 366–368, 34 L.Ed.2d 415 (1972). As noted *supra,* however, the housing claims in this case are particularly speculative and, as was apparent at oral argument, the real debate on ripeness rests on the soundness of the gerrymander/voting rights claims. As to those claims, we do not think such a generous standing allowance can be engrafted. *See Ad Hoc Comm. of Concerned Teachers v. Greenburgh #11 Free Union School Dist.,* 873 F.2d 25, 28 (2d Cir.1989) (noting that, absent some statutory directive relaxing or broadening standing requirement, deprivation of benefits of interracial association has never been recognized as sufficient to confer Article III standing). We have been referred to no such statutory allowance embodied in the Voting Rights Act, nor can we divine one. To the contrary, it seems to us that injury of this nature, if deemed sufficient to confer standing, inevitably will invite friction with First Amendment freedoms. Although the Thirteenth and Fourteenth Amendments surely prevent private and public actors from carrying into practice certain discriminatory beliefs, the First Amendment just as surely protects the expression of discriminatory beliefs many of us find offensive as the price of "uninhibited, robust, and wide-open" debate on public issues. *New York Times v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964). *See also Weiss v. Willow Tree Civic Ass'n,* 467 F.Supp. 803, 818 (S.D.N.Y. 1979) (Weinfeld, J.) (noting "defendants have every right to band together [and petition the government] for the advancement of beliefs and ideas, however unpalatable the ideas or whatever the underlying motive").[15]

---

15. This does not mean, as plaintiffs apparently misperceive, that we think discriminatory motive is irrelevant and should be ignored by state or municipal officials in reviewing incorporation petitions. *See In re Greenberg,* 710 F.Supp. at 969 n. 6 (and accompanying text); *id.* 710 F.Supp. at 974–975 n. 11. To the contrary, we have stated very clearly that States are pro-

As to the institutional plaintiffs, they contend that the basic goals of the institutions are being thwarted by the alleged conspiracy and that this has led to a consequent diversion of institutional resources. They believe these financial losses confer standing under the teaching of *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). We disagree. In *Havens*, the organizational plaintiff provided counseling and referral services to clients in search of housing. To combat the defendants' alleged practice of "racial steering," *id.* at 366 n. 1, 102 S.Ct. at 1118 n. 1, the organization was forced to spend additional resources for its counseling and referral services. The Court held this to be sufficient injury for standing purposes. *Id.* at 379, 102 S.Ct. at 1124. That is very different from the situation here, where the institutional defendants have injected themselves into this matter in the interest of furthering their societal goals, and have spent resources to advance their positions. That is not *Havens*. Indeed, *Havens* reaffirms the notion that an allegation which fundamentally asserts a "setback to the organization's abstract societal interests" will not satisfy the standing requirement. *Id.* (citing *Sierra Club v. Morton*, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972)). Stripped of its trappings, however, we think the institutional plaintiffs in reality assert just such a "setback."

In *Sierra Club*, the Court held that the plaintiff organization's long-standing interest in protecting the environment did not confer on it standing to challenge the Government's development of a national park. Undoubtedly the Sierra Club had devoted institutional resources in opposing the Government's action, but the Court nonetheless found the Club's "special interest" in the project and environmental problems generally to be insufficient for standing purposes absent some personal harm. *Sierra Club*, 405 U.S. at 734–740, 92 S.Ct. at 1365–1368. We think *Sierra Club*, and not *Havens*, controls the issue here.[16]

Thus, because we find the claims as asserted to be unfit for judicial resolution, and because we see no cognizable hardship flowing from our decision to withhold consideration at this time, we find that plaintiffs' claims are not ripe and counts I, II, and III of the FAC must be dismissed.

Plaintiffs emphasized repeatedly at oral argument that the distinguishing feature in this case is the filing of the incorporation petition. Until that time, plaintiffs admit that the COUP defendants had engaged in protected organizational activity, but that once the concrete step of filing the incorporation petition was taken they say the character of COUP's conduct changed and became actionable. For all the reasons outlined above, we disagree; but even if plaintiffs are correct and the mere filing of an incorporation petition renders this case fit for judicial intervention, we think the complaint must be dismissed on a further and very related ground—failure of subject matter jurisdiction due to the current lack of state involvement in the conspiracy.

### (b) Subject Matter Jurisdiction

Section 1985(3) provides, in pertinent part:

> If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws **[the "deprivation clause"]**; or for the

scribed from approving gerrymandered plans contrived due to racial animus. *Id.* 710 F.Supp. at 968 n. 5.

**16.** Of course, the institutional plaintiffs are entitled to sue in a representational capacity on behalf of any of their members who have been injured, but that right is derivative of the individual member's right to sue. *NAACP v. Button*, 371 U.S. 415, 428, 83 S.Ct. 328, 335, 9 L.Ed.2d 405 (1963) (citing *NAACP v. Alabama ex rel.*

*Patterson*, 357 U.S. 449, 458–460, 78 S.Ct. 1163, 1169–1170, 2 L.Ed.2d 1488 (1958)). Consequently, that allowance is not implicated here in light of our earlier holdings as to the individual plaintiffs.

We add only that we perceive certain other infirmities related to standing, both as to the individual and institutional plaintiffs, that we need not elaborate upon here given our holding as to ripeness.

purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws [**the "preventing-or-hindering clause"**]; ... the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

Plaintiffs rely on both the deprivation and preventing-or-hindering clauses in support of their claims. They contend that either there has been state action in furtherance of the conspiracy's goals or, alternatively, that state action is immaterial since the reach of section 1985(3) extends to embrace private conspiracies. The former conclusion is without merit and the latter, although generally unassailable, *see Griffin v. Breckenridge*, 403 U.S. 88, 104–106, 91 S.Ct. 1790, 1799–1800, 29 L.Ed.2d 338 (1971), is not controlling here.

1. The Deprivation Clause

■■■ Section 1985(3) contains no "color of state law" or "state action" requirement. Nonetheless, it is a remedial statute; it creates no substantive rights in itself. *United Brotherhood of Carpenters & Joiners v. Scott*, 463 U.S. 825, 833, 103 S.Ct. 3352, 3358, 77 L.Ed.2d 1049 (1983) (citing *Great Am. Fed. Savings & Loan Ass'n v. Novotny*, 442 U.S. 366, 372, 99 S.Ct. 2345, 2349, 60 L.Ed.2d 957 (1979)). Consequently, in *Scott* the Court made clear that if the underlying right allegedly

deprived by the purported conspiracy derives from a proscription against state action, state involvement in the conspiracy is a necessary predicate to the section 1985(3) claim. *Scott*, 463 U.S. at 830–833, 103 S.Ct. at 3357–3358. Thus, in *Griffin v. Breckenridge* no state action was required since the underlying right allegedly deprived—the constitutional right to travel—served as a shield against both public and private conduct, whereas in *Scott* state action was required since the rights allegedly protected—First Amendment rights made applicable to the States by the Fourteenth Amendment—are rights guaranteed only from the excesses of state behavior. *Id.* at 831–833, 103 S.Ct. at 3357–3358.[17]

■■■ The plaintiffs concede that the rights allegedly deprived by the COUP conspiracy (or, more accurately, those rights threatened with deprivation) are rights protected only from state action.[18] They argue, however, that the *Scott* state action requirement is satisfied here. We disagree.

The conduct of private parties may be characterized as state action generally under the following circumstances:

First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible.... Second, the party charged with the deprivation must be a person

---

**17.** To the extent *Weise v. Syracuse Univ.*, 522 F.2d 397, 408 (2d Cir.1975), a pre-*Scott* case cited by plaintiffs, holds to the contrary, we find that it has been overruled by *Scott*. We reach the same conclusion as to similar, pre-*Scott* authority outside this circuit cited by plaintiffs. *But see Cohen v. Illinois Inst. of Technology*, 524 F.2d 818, 827–829 (7th Cir.1975) (Stevens, J.) (anticipating *Scott* and holding that if underlying right is triggered by state action, section 1985(3) conspiracy to deprive persons of that right must involve state), *cert. denied*, 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 187 (1976); *Weiss v. Willow Tree Civic Ass'n*, 467 F.Supp. 803, 811–815 (S.D.N.Y.1979) (Weinfeld, J.) (same). We add that Justice Stevens, who authored *Cohen*, joined the majority in *Scott*.

**18.** *See United States v. Guest*, 383 U.S. 745, 755, 86 S.Ct. 1170, 1176, 16 L.Ed.2d 239 (1966)

(Equal Protection Clause protects individuals only from state action); *Terry v. Adams*, 345 U.S. 461, 473, 73 S.Ct. 809, 815, 97 L.Ed. 1152 (1953) (Frankfurter, J.) (Fifteenth Amendment requires state action). As to the remaining Federal statutory rights and the state constitutional and statutory rights, the plaintiffs do not contest the conclusion that each is triggered only due to state action and, indeed, they expressly "assume" for present purposes that the federal and state voting rights provisions apply only against state conduct. Plaintiffs' Supplemental Brief, at 25 n. 12. Thus, any reliance plaintiffs place on *Perry v. Manocherian*, 675 F.Supp. 1417, 1427–1428 (S.D.N.Y.1987) is misplaced since the underlying rights allegedly deprived in that case extended to private conduct.

who may fairly be said to be a state actor. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982). The plaintiffs' position, in essence, is that COUP's utilization of the state-created village incorporation process satisfied the first prong, and the town supervisor's actions in calling a public hearing on the petition satisfies the second prong. This conclusion cannot withstand even the most generous reading afforded existing case law.

Amplifying the above test, the *Lugar* Court suggested that a private person "may fairly be said to be a state actor" either "because he has acted *together with or has obtained significant aid from state officials,* or because his conduct is otherwise chargeable to the State." *Id.* (emphasis added). In two decisions rendered the same day as *Lugar,* the import of the "significant aid" phraseology was made clear. In *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2785, 73 L.Ed.2d 534 (1982), patient transfers effected by a state-regulated nursing home were held not to constitute state action since "a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." Likewise, in *Rendell-Baker v. Kohn,* 457 U.S. 830, 841, 102 S.Ct. 2764, 2771, 73 L.Ed.2d 418 (1982), personnel decisions by a private school regulated and partially funded by the State were found to retain their private characteristics since those actions "were not compelled or even influenced by any state regulation." Thus,

as the Court has made clear, the mere use by private parties of existing state procedures does not in and of itself give rise to state action; it is only "when private parties make use of state procedures with the *overt, significant assistance* of state officials [that] state action may be found." *Tulsa Professional Collection Serv., Inc. v. Pope,* 485 U.S. 478, ——, 108 S.Ct. 1340, 1345, 99 L.Ed.2d 565 (1988).[19]

That requisite measure of state support, assistance, or compulsion is patently lacking here. COUP has invoked the state-created procedures for village incorporation, but that alone is not enough. The only state act allegedly in furtherance of the scheme was the town supervisor's actions in convening and chairing the public hearing on the petition—purely ministerial actions he was required to take pursuant to New York law. Conversely, the only substantive action he has taken (issuance of the December 1 Decision) was in *opposition* to COUP's efforts. How, then, it seriously can be argued that the alleged conspiracy has received the imprimatur or assistance of the State is, to this court's mind, an unfathomable contention.

Alternatively, plaintiffs insist that COUP has acted "together with" state officials, *Lugar,* 457 U.S. at 937, 102 S.Ct. at 2753, characterizing the State as a "joint participant" in the alleged conspiracy. The State's interests, however, as manifested by the December 1 Decision, are completely *antagonistic* to COUP's alleged purposes. State action cannot be posited on a joint-participation theory given this posture. *NCAA v. Tarkanian,* —— U.S. ——, ——, n. 16, 109 S.Ct. 454, 464, n. 16, 102 L.Ed.2d 469 (U.S.1988).[20] The instant facts, there-

**19.** Thus, in *Tulsa Professional,* actions by an estate's executrix in publishing a notice advising creditors of the pending probate proceedings were found to include sufficient indicia of state involvement. In addressing whether the published notice satisfied due process, the Court found state action because the executrix was appointed by probate court, and the statutory notice requirement was not self-executing (indeed, the executrix in that case was acting under direct court order to publish the notice). Further, the probate court alternatively was described as being "intimately involved" with or as playing a "pervasive and substantial" role in the

probate proceedings. *Tulsa Professional,* 485 U.S. at ——, 108 S.Ct. at 1345.

**20.** Indeed, we emphasize here that the project is a county-sponsored project with the implicit, if not explicit, backing of the State. The project developer, after all, is a not-for-profit corporation operated by the Governor's son, Andrew Cuomo. In addition, given this public sponsorship among other things, we repeat a musing voiced in our remand decision, to wit, it remains unclear to us just how incorporation of the Village of Mayfair Knollwood will be able to stop completion of the proposed project.

fore, contrast starkly with *Dennis v. Sparks,* 449 U.S. 24, 28–29, 101 S.Ct. 183, 186–187, 66 L.Ed.2d 185 (1980), where private parties who bribed and corruptly conspired with a local judge were found to be state actors. Just as the alleged COUP conspiracy cannot incorporate the Village of Mayfair Knollwood without resort to state procedures, neither could the private parties in *Sparks* effectuate their scheme (enjoining mineral production from plaintiff's oil leases) in the absence of a court order. It was the official *action,* however —issuance of a court order corruptly obtained—and not the mere filing of a civil complaint that provided the necessary state involvement with the conspiracy. Likewise, in *Lugar* state action was found because an ex parte order of attachment had been *issued* by a state court and *executed* by the county sheriff. *Lugar,* 457 U.S. at 924, 102 S.Ct. at 2747. No such meaningful or substantive state act in furtherance of the alleged COUP conspiracy has occurred here.

"In the final analysis the question is whether 'the conduct allegedly causing the deprivation of a federal right [can] be fairly attributable to the State.'" *Tarkanian,* — U.S. at ——, 109 S.Ct. at 465–466. (quoting *Lugar,* 457 U.S. at 937, 102 S.Ct. at 2753). It would be anomalous indeed for us to reach that conclusion here, particularly in light of the December 1 Decision, and we decline the invitation. Since the rights allegedly deprived here are found in guarantees proscribing state action, and since state involvement with the conspiracy has not yet manifested itself in any meaningful way, plaintiffs' reliance on the deprivation clause of section 1985(3) is unavailing.

### 2. The Preventing-or-Hindering Clause

Alternatively, plaintiffs contend that COUP's actions, if they do not "involve" the State, broadly "affect" the State and that this is sufficient to maintain a cause of action under the preventing-or-hindering clause of section 1985(3). Although we do not disagree with that conclusion, we find that the preventing-or-hindering clause is inapplicable to this case.

*Scott* held that, "to make out [a] § 1985(3) case, it [is] necessary for [plaintiffs] to prove that the State was somehow involved in *or affected by* the conspiracy." *Scott,* 463 U.S. at 833, 103 S.Ct. at 3358 (emphasis added). *See also id.* at 830, 103 S.Ct. at 3357 (must prove that "State is involved in the conspiracy or that the aim of the conspiracy is to influence the activity of the State"); *id.* at 831, 103 S.Ct. at 3357 (conspiracy must "somehow involve or affect a State"). The *Scott* Court considered section 1985(3) generally, and did not parse its various clauses. Nonetheless, we think the "affect-a-State" language is obviously and primarily directed toward the preventing-or-hindering clause.[21]

▇▇▇▇ We reach this conclusion because the preventing-or-hindering clause, by its terms, is designed to proscribe behavior that impedes the State's ability to safeguard equal protection. Thus, as this circuit has observed, it would be incongruous to require state involvement if the preventing-or-hindering clause is to be given effect since a State would rarely if ever be hindering its own efforts. *People v. 11 Cornwell Co.,* 695 F.2d 34, 43 (2d Cir.1982). Consequently, and beyond those conspiracies depriving people of rights secured against private conduct, the language of section 1985(3) must be read to reach wholly private conspiracies which "affect" (i.e., prevent or hinder) the State's ability to secure equal protection. We think *Scott* so holds. Assuming the constitutional firmness of that construction, we find that the preventing-or-hindering clause is inapplicable to this case.[22]

21. Section 1985(3) also includes two additional clauses based on preventing an individual from evidencing his or her support for presidential electors or members of Congress which, it appears, have rarely been invoked. A fifth and final clause of the statute merely outlines the remedy available and is not implicated by the analysis in *Scott.*

22. We hasten to emphasize that *Scott* did not address the underlying constitutional premise to this construction, to wit: If the preventing-or-hindering clause reaches wholly private conspir-

■ In *11 Cornwell*, the Second Circuit concluded that the preventing-or-hindering clause must reach private conspiracies since "there would *almost never* be a situation in which the State would be involved in hindering its own efforts to secure equal protection to its citizens...." *11 Cornwell*, 695 F.2d at 43 (emphasis added). The "almost-never" situation referenced by the court is, in our view, exactly the scenario manifested by the instant facts. The COUP defendants, in the absence of state involvement, cannot effectuate their goal of incorporating the Village of Mayfair Knollwood and, following therefrom, deprive plaintiffs of allegedly protected voting and housing rights. To the contrary, the town supervisor (who has been delegated initial review authority by the State pursuant to New York's Village Law, *supra* note 2) must first approve the petition and that approval, if challenged, must then survive review by the State courts via an Article 78 proceeding. Until the State acts, therefore, either through the town supervisor or the State courts, the COUP petition cannot prevent or hinder the State in its efforts to secure equal protection of the laws (assuming the validity of the substantive deprivations here alleged). Put differently, the State must affirmatively act in this case if equal protection rights are to be infringed, bringing these facts within the "almost-never" situation alluded to in *11 Cornwell*. The preventing-or-hindering clause, therefore, is inapplicable.

This analysis, it seems to us, is further compelled by section 1985(3)'s injury requirement. For a cognizable claim to exist, the statute, outlined *supra*, requires an act in furtherance of the conspiracy which injured plaintiff in his or her person or property. The Supreme Court has referred to the injury requirement as a jurisdictional element of a section 1985(3) claim. *See Scott*, 463 U.S. at 828–829, 103 S.Ct. at 3355–56 (citing *Griffin*, 403 U.S. at 103, 91 S.Ct. at 1798). *Cf. Nalle v. Oyster*, 230 U.S. 165, 182, 33 S.Ct. 1043, 1047, 57 L.Ed. 1439 (1913) (noting "well-settled rule is that no civil action lies for a conspiracy unless there be an overt act *that results in damage to the plaintiff*") (emphasis added). Whatever else *Scott* or *11 Cornwell* may hold as to private conspiracies under section 1985(3), they could not and did not vitiate the statutory injury requirement in such cases. Thus, since we believe that no cognizable injury can result here or even be sufficiently threatened until the State acts to give effect to COUP's efforts, *supra* Section II(a), the preventing-or-hindering clause cannot be applicable on these facts unless the jurisdictional prerequisite of injury is to be read out of the statute. Yet, if plaintiffs' broad reading of *Scott* is correct (i.e., the alleged conspiracy is actionable simply because it *a*ffects the State even though not one of the conspiracy's purported harms can be *e*ffected without State assistance), then that would very much be the result here.[23]

Plaintiffs rely for their argument on a trilogy of cases in which the preventing-or-hindering clause was invoked in support of claims against private conspiracies. Each case, however, represents what we believe to be the paradigmatic facts amenable to a claim under this clause, viz, a claim where private parties, on their own accord and without need of affirmative State assistance in furtherance of the conspiracy's efforts, were able to affect the State's ability to safeguard equal rights. Reliance on those cases, therefore, is inapposite. *See 11 Cornwell*, 695 F.2d at 43 (colorable pre-

---

acies infringing equal protection rights, on what constitutional authority did Congress act in passing such a statute? Put differently, "the question [is] whether Congress has the power under section 5 of the Fourteenth Amendment to extend Fourteenth Amendment guarantees to purely private conduct." *11 Cornwell*, 695 F.2d at 43. This issue has been left open by the Court, *see Griffin*, 403 U.S. at 107, 91 S.Ct. at 1801, and we need not pass upon it now given our ultimate holding.

**23.** We add that since not even threatened injury is cognizable here, we need not decide whether threatened injury alone is sufficient to sustain a claim under section 1985(3). We may assume that it is (notwithstanding our reservations to the contrary), for even that lessened threshold cannot be met here.

venting-or-hindering claim where private conspirators had bought at private sale a home they knew the State had already targeted for use in the effort to deinstitutionalize mentally retarded persons, and the conspirators thereafter refused to sell the home to the State for the envisioned use); *Brewer v. Hoxie School Dist. No. 46,* 238 F.2d 91, 93–94, 103–105 (8th Cir.1956) (private conspiracy had prevented and hindered school board in carrying out desegregation effort where conspirators had already committed numerous acts of trespass on school property, threatened and intimidated board members, and attempted to persuade students to boycott schools, thereby causing cancelation of a school session, reduction in school attendance, and loss of school revenues); *New York State Nat'l Org. for Women v. Terry,* 704 F.Supp. 1247, 1260 (S.D.N.Y.1989) (anti-abortion protesters were impeding State's ability to secure for "women who choose abortion equal access to medical treatment" through unannounced, mass protests at abortion clinics that were designed to and did impede state's efforts to ensure access to those clinics).[24] The crucial feature distinguishing this case is that COUP cannot hinder the State in its efforts to secure equal protection unless and until the State approves the incorporation petition. Indeed, as evidence of that fact, we were told at oral argument that the housing project is moving forward apace, with an environmental review now underway.

Consequently, we find that plaintiffs have failed to state a claim under section 1985(3).[25]

## III. ATTORNEY'S FEES OR SANCTIONS

The COUP defendants move for attorney's fees under 42 U.S.C. § 1988 ("section 1988") or sanctions under Rule 11. We may award a prevailing defendant attorney's fees under section 1988 if the complaint was unreasonable, frivolous, or groundless, *Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 252 (2d Cir. 1985), and sanctions under Rule 11 if the complaint was not reasonably believed to be grounded in law or in a good-faith argument for the law's extension, *id.* at 254. Neither test has been met here.

Although we have disagreed with the arguments made by plaintiffs' counsel, we think the arguments made were reasonable and in good faith and the case touches (albeit prematurely) on matters involving certain substantial and important federal rights. Consequently, we think an award of fees or sanctions would be both improvident and unsupported, and the motions are denied.

## Conclusion

For all of these reasons, we hold that, as to the COUP defendants, this case is not yet ripe for decision or, alternatively, that a cognizable federal claim has not been asserted. In reality, of course, our holding as to subject matter jurisdiction is largely the substantive manifestation (no state action) of the procedural infirmity (ripeness) that afflicts this case. Simply put, we believe that until the State acts to give some effect to COUP's incorporation efforts, this matter is simply inappropriate for judicial intervention. Not only does this conclusion reflect both our concern for federalism and our respect for the political process, the predominant currents running through our remand decision, but it is bottomed on legal

---

**24.** We add that in each of these cases the state actor allegedly being hindered was a named or intervening *plaintiff.* In this case the state actor (Town Supervisor Veteran) is a named *defendant.* Since we find the preventing-or-hindering clause inapplicable in any event, we do not ascribe any significance to this fact (although it adds certain confirmation to our conclusion that this is really a deprivation clause case).

**25.** Having found that the absence of state action in this case dooms the section 1985(3) counts,

we do not conclusively address whether the deprivation of the state rights here asserted may alone serve as the predicate for a section 1985(3) count. *See Scott,* 463 U.S. at 833–834, 103 S.Ct. at 3358–3359 (generally leaving open that question); *Traggis v. St. Barbara's Greek Orthodox Church,* 851 F.2d 584, 586–591 (2d Cir. 1988) (same). Nor do we address whether all of the underlying rights herein alleged, federal or state, may serve as predicates for a section 1985(3) claim.

principles that determine when and why a Federal court may act to issue injunctive relief and award compensatory damages, the issues relevant here. Counts I, II, and III of the FAC, therefore, are dismissed.

SO ORDERED.